UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| LARRY WAYNE SMITH, | ) | |
| Petitioner, | ) | Case No. 7:14cv00686 |
| v. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| DIRECTOR, VIRGINIA DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | By:    Joel C. Hoppe |
| Respondent. | ) | United States Magistrate Judge |

Larry Wayne Smith, a Virginia prisoner proceeding *pro se*, petitioned this Court for a

writ of habeas corpus under 28 U.S.C. § 2254. Pet., ECF No. 1. The Respondent, Director of the

Virginia Department of Corrections ("Director"), moved to dismiss the petition, ECF No. 8, and

Smith responded, ECF No. 13. The matter is before me for a report and recommendation by

referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 19. Having considered the parties' filings, the

available state-court records, and the applicable law, I respectfully recommend that the presiding

District Judge grant the Respondent's motions to dismiss, and dismiss the petition with

prejudice.

I. Standard of Review

A person in custody pursuant to the judgment of a state court claiming the right to be

released from a state sentence must show "that he is in custody in violation of the Constitution or

laws or treaties of the United States." 28 U.S.C. § 2254(a). The prisoner ultimately must prove

the facts supporting his grounds for federal habeas relief by a preponderance of the evidence. *See*

*Holland v. Jackson*, 542 U.S. 649, 654–55 (2004) (per curiam). On the respondent's motion to

dismiss, however, "the familiar standards in Rule 12(b)(6) of the Federal Rules of Civil

Procedure apply." *Walker v. Kelly*, 589 F.3d 127, 138 (4th Cir. 2009) [hereinafter *Kelly*] (citing

the current R. Gov. § 2254 Cases in U.S. Dist. Cts., Rule 12 (2010)). Thus, a motion to dismiss a

habeas petition challenges whether the petition's factual allegations state a claim upon which

1

relief can be granted under 28 U.S.C. § 2254. *Id.*; *Walker v. True*, 399 F.3d 315, 320 (4th Cir. 2005).

To survive a motion to dismiss, "the petition and any attached exhibits," R. Gov. § 2254 Cases in U.S. Dist. Cts., Rule 4, "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Kelly*, 589 F.3d at 139. A claim is "facially plausible" when the well-pled facts "allow[] the court to draw the reasonable inference that the [respondent] is liable for the misconduct alleged" under the governing law. *Iqbal*, 556 U.S. at 678. This "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility," *id.*, that the state prisoner is in custody in violation of his federal rights. *See Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977); *cf. United States v. White*, 366 F.3d 291, 297 (4th Cir. 2004) ("A court cannot summarily dismiss a [habeas] petitioner's allegations simply because the petitioner has yet to prove them by a preponderance of the evidence.").

Determining whether a petition clears this threshold is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In doing so, the court accepts as true all well-pled facts and construes those facts and all reasonable inferences in the petitioner's favor.[1] *Kelly*, 589 F.3d at 139. The court may also consider the necessary state-court records, R. Gov. § 2254 Cases in U.S. Dist. Cts., Rule 5(c)–(d), and matters of public record in conjunction with a Rule 12(b)(6) motion. *Kelly*, 589 F.3d at

---

[1] The court also must construe *pro se* pleadings liberally, so that any potentially valid claim can be fairly decided on its merits rather than the *pro se* litigant's legal acumen. *See Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 194 (4th Cir. 2015). Still, a *pro se* petitioner must "allege facts that state a cause of action, and district courts are not required 'to conjure up questions never squarely presented to them.'" *Considder v. Medicare*, No. 3:09cv49, 2009 WL 9052195, at *1 (W.D. Va. Aug. 3, 2009) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)), *aff'd* 373 F. App'x 341 (4th Cir. 2010).

2

139. Summary dismissal is not appropriate when the prisoner alleges facts that, if accepted as true and not "directly contradicted" by the record, *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005), would entitle him to federal habeas relief on a particular claim. *See True*, 399 F.3d at 320.

## II. Background

Steven Rutledge worked as an undercover informant for law enforcement.[2] In this capacity, Rutledge purchased drugs from Johnny Clark, resulting in criminal charges being brought against Clark. On March 3, 2010, Clark obtained, through discovery in his criminal case, a copy of a recording of the drug transaction between him and Rutledge. Clark played the recording for Smith, who stated that he would retaliate against Rutledge.

Smith, Timothy Osborne, and Johnny Roberts saw Rutledge on March 4, 2010, and Smith promised to give Rutledge pills if he came to his house the following day. The offer of pills was a ruse, and Smith intended to assault Rutledge when he arrived. Rutledge, however, did not show up at Smith's house. Later on March 5, 2010, Smith, Osborne, and Roberts saw Rutledge driving his vehicle. Smith caught up to Rutledge and waved him over. Smith told Rutledge that he would share a pill with him if he followed Smith. Smith then led them to the "duck pond" where they parked their vehicles. Smith, who was armed with a handgun, got out of his vehicle and approached Rutledge's vehicle where Rutledge and his wife, Traci Rutledge ("Traci"), were sitting. Smith confronted Rutledge about being an informant and threatened him with the handgun. Traci pointed a rifle, which she later testified was unloaded, at Smith. Smith

---

[2] The facts are taken from the opinion of the Court of Appeals of Virginia. *Smith v. Virginia*, No. 1267-11-3, slip op. 2–4 (Va. Ct. App. Dec. 8, 2011) [hereinafter Va. Ct. App. Slip Op.], ECF No. 15 at 10-15.

3

claims that he pushed the rifle away. He then stepped away and fired multiple shots into the vehicle, killing Rutledge and seriously wounding Traci.

Smith told law enforcement officers that Traci fired the rifle at him, causing a burn to his forearm. The officers used a gunshot residue kit to take a sample from Smith's forearm. They also took a picture of Smith's forearm and sent the picture and the gunshot residue sample to the Virginia Department of Forensic Science ("Laboratory") for testing and identification of the cause of Smith's injury. A scientist at the Laboratory testified that, except in rare instances, he could not distinguish residue from different firearms, and to perform the analysis, he needed the spent shell casings from the firearms. Law enforcement recovered shell casings from Smith's handgun, but none from the rifle Traci pointed at Smith. Thus, the Laboratory did not test the sample.

Law enforcement also requested that the Laboratory conduct DNA, fingerprint, and firearm testing on the rifle. A latent fingerprint examiner testified that he saw no ridge detail on the rifle and discontinued further latent print testing so as to preserve the evidence for DNA testing. A forensic scientist conducted DNA testing on the rifle, but was unable to develop a DNA profile and could draw no conclusions from the results of the test.

A.    *Trial Court Proceedings*

Smith was arrested on March 5, 2010, arraigned three days later, and held without bail. A preliminary hearing was scheduled for March 31, 2010, but it was continued six times–four at the request of the prosecutor and two at the request of attorneys for co-defendants Osborne and Roberts. On August 13, 2010, the preliminary hearing was held, and the court found probable cause. On September 13, 2010, a grand jury indicted Smith on one count of first degree murder, one count of malicious wounding, and three counts of using a firearm in the commission of a

felony. A jury trial began on November 3, 2010, and Smith was found guilty of second degree murder of Rutledge, malicious wounding of Traci, and two counts of use of a firearm in the commission of a felony. The circuit court sentenced him to 53 years in prison.

## B.     Direct Appeal Proceedings

Smith appealed to the Court of Appeals of Virginia. He asserted two assignments of error, both of which he had raised unsuccessfully in the trial court. First Smith argued that his right to a speedy trial was violated when he was held for 162 days before having a preliminary hearing. Second, he argued that the Commonwealth acted in bad faith in stopping the latent fingerprint analysis and by not conducting the gunshot residue test to determine whether the rifle was discharged. The court of appeals rejected both arguments. It found no evidence that the Commonwealth acted in bad faith in not obtaining the gunshot residue and latent fingerprint testing. It also considered the reasons for the delay in holding a preliminary hearing, and it determined that Smith's constitutional rights were not violated. Va. Ct. App. Slip Op. 2–6.

Smith initially did not appeal to the Supreme Court of Virginia. On November 12, 2012, Smith filed a habeas petition in the Supreme Court of Virginia alleging, among other issues, that his counsel was ineffective for not appealing the decision of the court of appeals to the supreme court. First State Pet., ECF No. 24. The court granted Smith's habeas petition limited to awarding him a direct appeal and without prejudice to his right to file a subsequent petition. Order, ECF No. 24-2, at 17–18. Smith then filed a direct appeal, which the Supreme Court of Virginia refused on January 24, 2014. Order, ECF No. 11, at 57.

## C.     State Habeas Proceedings

On February 18, 2014, Smith filed a second habeas petition in the Supreme Court of Virginia. Except for the claim that counsel was ineffective for not pursuing an appeal, Smith

Case 7:14-cv-00686-GEC-JCH   Document 25   Filed 02/01/16   Page 5 of 42   Pageid#: 784

raised the same grounds—ineffective assistance of counsel and prosecutorial misconduct—as in his first habeas petition. ECF No. 24-3. The Director moved to dismiss Smith's state habeas petition. ECF No. 24-4. The Supreme Court of Virginia granted that motion and dismissed Smith's petition. As to Smith's claims of ineffective assistance of counsel, the court determined that none of the claims met either the performance or the prejudice prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The court also rejected the legal basis for Smith's cumulative-errors argument. The court found that Smith's claims of prosecutorial misconduct were barred by the rule in *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974), because Smith could have raised them at trial and on direct appeal. *Smith v. Dir., Va. Dep't of Corrs.*, No. 140295, slip op. (Va. Oct. 14, 2014) [hereinafter Va. Sup. Ct. Slip Op.], ECF No. 24-5, at 16–23.

Smith asked the Virginia Supreme Court for a rehearing, ECF No. 24-5, at 24–32, but the court denied his request, *id.* at 33.

D.      *Federal Habeas Proceedings*

Smith filed his habeas petition in this Court on December 16, 2014. He pled eleven grounds for relief under 28 U.S.C. § 2254. The grounds are identical to the nine raised in the Supreme Court of Virginia on habeas and the two brought on direct appeal:

I. Smith was denied the effective assistance of counsel, due process, fair trial, presumption of innocence, and equal protection under the United States and Virginia Constitutions:

A. Trial counsel failed to investigate and subpoena a witness, Tim Osborne, whose testimony would have impeached the testimony of Traci Rutledge and Johnny Roberts.

B. Trial counsel failed to seek dismissal of the charges after the Commonwealth's Attorney engaged in prosecutorial misconduct by suppressing the testimony of Tim Osborne by threatening him if he testified for the defense and making him leave the courthouse.

6

C. Trial counsel failed to subpoena Harold Smith whose testimony would have impeached the testimony of Traci Rutledge and Johnny Roberts.

D. Trial counsel failed to subpoena Jewel Woliver to testify about what Tim Osborne told her.

E. Trial counsel acted under a conflict of interest when he continued representing Smith after the prosecutor gave him a transcript of a phone call between Smith and his family wherein Smith was bad-mouthing his counsel.

F. Trial counsel failed to pursue scientific testing of a rifle, pistol, shell casings fired from the pistol, swabs taken of Smith, swabs taken of Steven Rutledge, and the inside of the Rutledge's truck to determine:

> 1. Whether the gunshot residue collected from Smith's left forearm, the inside of the Rutledge's truck, and samples taken from Steven Rutledge came from ammunition consistent with the rifle or can be connected with the rifle in any way;

> 2. Whether such gunshot residue came from Smith's pistol or excludes the pistol;

> 3. Whether both DNA analysis and latent fingerprint testing could have been done on the rifle without excluding one testing for the other.

G. The cumulative effect of trial counsel's errors deprived Smith of the effective assistance of counsel and caused prejudice.

II. Smith was denied a fair trial under the United States and Virginia Constitutions:

A. The Commonwealth's Attorney committed prosecutorial misconduct by suppressing the testimony of Tim Osborne by threatening him if he testified for the defense and making him leave the courthouse.

B. The Commonwealth's Attorney committed prosecutorial misconduct when he put a wedge in the attorney-client relationship by giving Smith's counsel a transcript of a phone call between Smith and his family wherein Smith was bad-mouthing his counsel.

III. The trial court erred in denying Smith's motion to set aside the verdict based on the Commonwealth's intentional and deliberate cancellation of tests that may have disclosed exculpatory evidence in support of Smith's claim of self-defense.

IV. The trial court erred in denying Smith's motion to dismiss based upon a denial of a speedy probable cause hearing in violation of the Sixth Amendment to the United States Constitution.

Pet. 4–6. The Director filed his Rule 5 Answer and Motion to Dismiss[3] on March 9, 2015. ECF Nos. 7, 8.

## III. Discussion

Section 2254 authorizes federal courts to "entertain an application for a writ of habeas corpus" on behalf of a person claiming the right to be released from state custody "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The statute, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, sets several limits on the court's power to grant such applications. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see generally* 28 U.S.C. § 2254(b)–(e). First, a federal court cannot grant an application unless, with certain exceptions, the petitioner properly presented substantially the same claims in state court. *Cullen*, 563 U.S. at 181 (citing 28 U.S.C. § 2254(b), (c)); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Picard v. Connor*, 404 U.S. 270, 278 (1971).

"[A]n additional restriction applies" where the "application includes a claim that has been 'adjudicated on the merits in State court proceedings.'" *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)). Under section 2254(d), that application "shall not be granted with respect to [such a claim] unless . . . the adjudication of the claim" resulted in a decision that was:

> (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3] "Because the Commonwealth filed its answer to [Smith's] petition and its motion[s] to dismiss simultaneously, it technically should have filed the motion[s] under Rule 12(c) as one for judgment on the pleadings." *Walker*, 589 F.3d at 139. The Court "will construe the Commonwealth's motion[s] . . . under Rule 12(c) which is assessed under the same standard that applies to a rule 12(b)(6) motion." *Id.*

8

28 U.S.C. § 2254(d)(1)–(2). A federal habeas court "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). Finally, the federal court's "review is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S. Ct. at 1399. Thus, when the petitioner "fail[ed] to present enough evidence" to make his case to the state court, *Burt v. Titlow*, --- U.S. ---, 134 S. Ct. 10, 18 (2013) (Sotomayor, J., concurring), the federal habeas court cannot presume that the state court "unreasonably" rejected the merits of the petitioner's claim, *id.* at 17 (Alito, J., for the Court); *accord Holland*, 542 U.S. at 654–55

A.    *Exhaustion*

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin*, 541 U.S. at 29. To properly exhaust, the petitioner "must 'fairly present' his claim in each appropriate state court" so as to "alert[] that court of the federal nature of the claim." *Id.* "Fair presentation" means that "both the operative facts and the controlling legal principles" behind a specific federal habeas claim were "presented face-up and squarely," *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000), "to every available state court," *Jones v. Sussex I State Prison*, 591 F.3d 707, 713 (4th Cir. 2010). *See also Baldwin*, 541 U.S. at 32 (holding that, as a general rule, "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so"); *Gray v. Netherland*, 518 U.S. 152, 163–64 (1996) ("[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must

9

include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief" under federal law). Federal courts need not consider the merits of any federal habeas claim if the petitioner still has a right under state law "to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(b)(2), (c); *accord Rhines v. Weber*, 544 U.S. 269, 276 (2005) (holding that a federal court may "in limited circumstances" stay proceedings and hold a "mixed" habeas petition in abeyance while the petitioner exhausts available state-court remedies). The petitioner bears the burden of proving proper exhaustion on a claim-by-claim basis. *Jones*, 591 F.3d at 713.

A separate obstacle to federal-habeas review—procedural default—arises when a claim "meets the technical requirements for exhaustion," *Coleman*, 501 U.S. at 732, "because the prisoner failed to abide by a state procedural rule," *Martinez v. Ryan*, --- U.S.---, 132 S. Ct. 1309, 1316 (2012), that "provides an independent and adequate state-law ground for [upholding] the conviction and sentence," *Gray*, 518 U.S. at 162. *See Baker*, 220 F.3d at 288 ("A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court."). Procedural default is an affirmative defense in federal habeas cases. *Gray*, 518 U.S. at 165–66; *Jones*, 591 F.3d at 716. Thus, "the burden rests with [the respondent] state to prove the adequacy of the relied-on procedural bar" on a claim-by-claim basis. *Jones*, 591 F.3d at 716. "A state rule is 'adequate' if it is firmly established and regularly or consistently applied by the state court" in similar cases, *id.*, and it is "'independent' if it does not 'depend on a federal constitutional ruling,'" *Brown v. Lee*, 319 F.3d 162, 169 (4th Cir. 2003) (brackets omitted) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).

10

A federal court cannot review a procedurally defaulted claim "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the court's refusal to consider the claim "will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. The cause-and-prejudice standard "requires the petitioner to show that some objective factor external to the defense impeded counsel's [or the *pro se* litigant's] efforts to raise the claim in state court" and "actual prejudice resulting from the errors of which he complains." *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991). Ordinarily, "neither a petitioner's *pro se* status [n]or his unfamiliarity with the legal system provides cause to excuse a procedural default." *Clark v. Dir., Dep't of Corr.*, No. 7:10cv6, 2010 WL 3585907, at *6 n.3 (W.D. Va. Sept. 13, 2010). A fundamental miscarriage of justice occurs where a constitutional violation "probably resulted in the conviction of one who is actually innocent" of the crimes for which he is incarcerated. *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Prieto v. Zook*, 791 F.3d 465, 469 (4th Cir. 2015).

"In Virginia, a non-death row inmate can exhaust his state remedies in one of three ways, depending on the nature of the [federal] claim he is raising." *Berglowe v. Dir., Va. Dep't of Corr.*, No. 7:05cv69, 2005 WL 2010159, at *1 (W.D. Va. Aug. 19, 2005). First, he can raise the claim on direct appeal to the Virginia Court of Appeals, with a subsequent appeal to the Virginia Supreme Court if the lower court rules against him. *Id.* Second, the prisoner can attack his conviction collaterally by filing a habeas petition in the circuit court where he was convicted, with a subsequent appeal to the Virginia Supreme Court if the trial court rules against him. *Id.* Third, he can file a habeas petition directly with the Virginia Supreme Court. *Id.*

Case 7:14-cv-00686-GEC-JCH   Document 25   Filed 02/01/16   Page 11 of 42   Pageid#: 790

The parties agree that all claims are exhausted.[4] The Director contends that the two claims of prosecutorial misconduct are procedurally defaulted under *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974). Smith agrees that the second of these claims—the prosecutor impermissibly put a "wedge" between Smith and his attorney by providing his attorney a transcript of a jail call in which Smith bad-mouthed him, Claim II.B.—is procedurally defaulted. Smith Reply Br. 2, ECF No. 13. This concession is appropriate as it appears that Smith knew of the claim prior to trial, but did not present it to the circuit court or on direct appeal. Smith disagrees that the other claim of prosecutorial misconduct, Claim II.A., was procedurally defaulted.

B.    *Procedural Default*

In Claim II.A., Smith argues that the Commonwealth's Attorney committed prosecutorial misconduct and suppressed evidence by threatening Timothy Osborne so that he left the courthouse and did not testify for Smith. He did not present this claim to the circuit court or to either the Virginia Court of Appeals or the Virginia Supreme Court on direct appeal. Reviewing Smith's habeas petition, the Virginia Supreme Court found that the claim was not cognizable on habeas because it was non-jurisdictional and could have been raised at trial or on direct appeal. Va. Sup. Ct. Slip Op. 7 (citing *Slayton*, 205 S.E2d 680).

Smith argues that he could not have raised this claim in the circuit court or on direct appeal because his attorney did not know of it at the time. Smith Reply Br. 2–5. He notes that his attorney Walter Rivers, by affidavit, stated that he was unaware of the prosecutor's alleged threat to Osborne. Smith contends that the *Slayton* rule was not "adequately" applied in his case

---

[4] To exhaust claims III and IV, Smith need not have presented them to the Virginia Supreme Court in his habeas petition because he raised them on direct appeal. *See Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000).

12

because the Virginia Supreme Court incorrectly found that he could have raised the claim at trial or on direct appeal. *Id.* at 6–7.

"*Slayton* holds that a state prisoner may not obtain state habeas relief by raising a non-jurisdictional claim of error in state habeas proceedings that he could have but did not raise at trial and on direct appeal." *Jones*, 591 F.3d at 716 (citing *Slayton*, 205 S.E.2d at 682). "Federal habeas courts are precluded from reviewing any claim that 'a state court has declined to consider [on] its merits on the basis of an independent and adequate state procedural rule.'" *Kelly*, 589 F.3d at 131 (quoting *Bacon v. Lee*, 225 F.3d 470, 476 (4th Cir. 2000)). "A state rule is 'adequate' if it is firmly established and regularly or consistently applied by the state court." *Brown v. Lee*, 319 F.3d 162, 169 (4th Cir. 2003). The Fourth Circuit has recognized that "the procedural default rule set forth in *Slayton* constitutes an adequate and independent state law ground for decision." *Mu'Min v. Pruett*, 125 F.3d 192, 196 (4th Cir. 1997). This Court must nonetheless assess whether *Slayton* is "adequate as applied in a particular case." *Jones*, 591 F.3d at 716 (quoting *Reid v. True*, 349 F.3d 788, 805 (4th Cir. 2003)); *see also Brown v. Lee*, 319 F.3d 162, 169 (4th Cir. 2003) ("[W]hether a particular state procedure is 'independent and adequate,' so as to bar consideration on the merits of a federal constitutional claim, is a question of federal, not state, law."). This is not to say that all challenges to Virginia courts' application of *Slayton* warrant federal scrutiny. An argument, such as Smith makes, that the state court incorrectly applied its own procedural rule is not subject to federal court review. *See Bacon*, 225 F.3d at 477 ("[I]t is not our role to resolve the issue or to review the correctness of the state [habeas] court's application of its state-law procedural rules."); *Ensley v. Johnson*, No. 3:10cv543, 2011 WL 6695004, at *4 (E.D. Va. Dec. 21, 2011); *cf. Stockton v. Murray*, 41 F.3d 920, 924 (4th Cir. 1994) ("The state court's finding of default bars federal habeas review of those claims absent a

13

showing of both cause and prejudice."). Rather, the appropriate inquiry is "whether the particular procedural bar is applied consistently to cases that are procedurally analogous." *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000).

Where the Fourth Circuit has found a procedural rule inadequate for a particular case, that court has determined that the rule was not applied consistently, meaning in cases other than just the one at bar. *See, e.g., Jones*, 591 F.3d 716; *Brown*, 319 F.3d at 175. Smith has made no such showing. Moreover, from the Court's review, it appears that the Virginia courts have consistently applied *Slayton* to bar consideration of claims that were not presented to the trial court or on direct appeal. *See, e.g., Mu'Min*, 125 F.3d at 197 ("Virginia courts regularly apply the *Slayton* default rule to federal constitutional claims that could have been, but were not, raised on direct appeal."). Thus, the *Slayton* rule provides an adequate ground for the state court's decision. Even so, this Court may still review Smith's claim if he can show cause to excuse the procedural default and prejudice resulting from the alleged constitutional violation, *see Coleman*, 501 U.S. at 750; *Stockton*, 41 F.3d at 924, which appears to be the focus of Smith's argument.

"A petitioner can establish cause by showing 'that the factual basis for [the] claim was unavailable to him'" in the trial court or on direct appeal. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001) (en banc) (quoting *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1997)). As grounds for cause to excuse the procedural default, Smith relies on Rivers's affidavit to show that he did not know of the claim of prosecutorial misconduct. Smith correctly notes that Rivers denied knowing of the alleged threat. Rivers Aff. 2, ECF No. 24-4, at 28–32. Counsel's lack of knowledge of a claim is a step toward establishing cause. Smith does not, however, address when he himself knew the claim, nor does he provide the circumstances of how and when he learned of it. *See* Smith Reply Br. 2–5. A review of the record reveals that Smith included this claim and

14

the affidavit from Osborne supporting it in his first habeas petition to the Virginia Supreme Court, which he filed on November 21, 2012. First State Pet. 6, 8; Osborne Aff., Oct. 22, 2012, ECF No. 24, at 54–55 (also filed at ECF No. 1-2, at 2–3). That petition and the date of Osborne's affidavit came after Smith was sentenced in the circuit court and after the Virginia Court of Appeals rejected his appeal. Although Smith certainly knew of this claim before he filed a direct appeal in the Virginia Supreme Court, the record does not establish when he learned of the claim. Because Smith carries the burden of demonstrating cause, he has not established grounds to excuse the procedural default. Moreover, he cannot show prejudice.

An analysis of prejudice requires consideration of the underlying claim for prosecutorial misconduct. *See Mickens*, 240 F.3d at 357. "Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to 'substantial government interference with a defense witness'[s] free and unhampered choice to testify.'" *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) (citations omitted). If a defendant can establish "substantial government interference, the inquiry moves to the question of whether it was prejudicial or harmless error." *Id.* (citing *United States v. Teague*, 737 F.2d 378, 384 (4th Cir. 1984)).

As evidence of prosecutorial misconduct, Smith submits the affidavit of Timothy Osborne. Osborne states that he was at the courthouse for Smith's trial and willing to testify on Smith's behalf. Osborne Aff. 1. The Commonwealth's Attorney told his counsel that if Osborne testified for Smith, he would be prosecuted to the fullest extent of the law, but if he left the courthouse and did not testify, the prosecutor would "go easy" on him. *Id.* Fearing that the prosecutor would make good on his threat, Osborne left the courthouse without testifying. *Id.* at 2.

The Director has not contested that the Commonwealth's Attorney threatened Osborne into not testifying. For the purpose of the motion to dismiss, the Court will presume that this factual assertion can establish government interference. In assessing any prejudice that could have resulted from the alleged misconduct of the Commonwealth's Attorney, the Court considers the proposed substance of Osborne's testimony and the effect of Osborne's absence on Smith's trial. Smith contends that Osborne would have provided testimony that rebutted the testimony of the Commonwealth's two primary witnesses—Traci Rutledge and Johnny Roberts—thereby helping to establish his theory of self-defense. The substance of Osborne's proposed testimony is, however, not the only consideration.

As discussed below, *infra* section III.C.1.a, the Virginia Supreme Court reasonably determined that Smith's counsel was not ineffective in making a tactical decision not to call Osborne as a witness. Rivers states that for a variety of reasons, none of which concerned the prosecutor's alleged threat, he did not intend to call Osborne as a witness. Rivers Aff. 1–2. Now that he has been advised of this alleged threat, Rivers does not state that this determination would have changed had he known of the threat at the time. Thus, the uncontested evidence establishes that Rivers would not have called Osborne as a witness, regardless of the threat. This leads to one conclusion: it was not the prosecutor's alleged threat that kept Osborne from testifying, but Smith's defense counsel's strategic decision not to call him as a witness.

In the cases where the Fourth Circuit has found witness intimidation to be prejudicial, the defense intended to rely on the witness's testimony. *See, e.g., United States v. Golding*, 168 F.3d 700, 702–03 (4th Cir. 1999); *United States v. MacCloskey*, 682 F.2d 468, 475–76, 479 (4th Cir. 1984); *see also Teague*, 737 F.2d at 384 ("In each of the cases requiring reversal, the defendant was denied either all of the testimony of the intimidated witness or all of the helpful testimony

16

from the witness."). Rivers's reasonable decision not to call Osborne as a witness distinguishes Smith's case. On this record, the Court cannot find that the alleged threat against a potential witness, whom defense counsel never intended to call to testify, had any impact on the outcome of Smith's trial.[5] Thus, Smith has not shown that he suffered prejudice from the alleged threat, and this claim should be dismissed.

## C.    Merits

The parties agree that the Virginia Supreme Court adjudicated and rejected Claims I.A–G, III, and IV.[6] This Court cannot grant habeas relief on any such claim unless the Virginia Supreme Court's adjudication of that claim resulted in a decision that was

> (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Generally, "[a] decision is contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth in [the holdings of] Supreme Court cases." *Lafler*, 132 S. Ct. at 1390; *accord Carey v. Musladin*, 549 U.S. 70, 75 (2006) ("'[C]learly established Federal law' in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."). A decision

---

[5] Smith argues that the prosecutor's threat suppressed Osborne's testimony. To prove a violation of *Brady v. Maryland*, a petitioner must show that the evidence was favorable, it was suppressed by the government either willfully or inadvertently, and the suppression was material, *i.e.*, it prejudiced the defense at trial. *Monroe v. Angelone*, 323 F.3d 286, 299–300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Thus, Smith's claim also fails under *Brady* because he has not shown that the alleged threat caused prejudice.

[6] In Claims III and IV, Smith challenges determinations of the Virginia courts regarding issues he raised on direct appeal. The Virginia Court of Appeals provided the last reasoned discussion of the issues raised in these claims. Its reasoning is imputed to the Virginia Supreme Court because it refused Smith's appeal without further reason. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

17

"involves an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

### 1. Claims of Ineffective Assistance of Counsel

Smith raises seven claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, a habeas petitioner must show that his counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the "performance" prong, the petitioner must show that counsel's performance fell outside the range of "reasonableness under prevailing professional norms." *Id.* at 688. Under the "prejudice" prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Courts must evaluate trial counsel's performance "from counsel's perspective at the time of the alleged error" and "apply a 'strong presumption' that trial counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). "When a state prisoner asks a federal court to set aside a [conviction or] sentence due to ineffective assistance of counsel," the federal court must "use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt*, 134 S. Ct. at 13. "The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable–a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schiro v. Landrigan*, 550

18

U.S. 465, 473 (2007)); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."). "And because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citation omitted).

a.   *Failure to Investigate and Call Tim Osborne as a Witness*

In Claim I.A., Smith faults his counsel for not adequately investigating Tim Osborne's testimony and then not subpoenaing him to testify at trial. Smith asserts that Osborne's testimony would have impeached the version of events recounted at trial by Traci Rutledge and Johnny Roberts. Smith Br. 6–13, ECF No. 1-1. Both witnesses testified that Smith lured the Rutledges to an isolated area, approached their vehicle, pulled a handgun, angrily confronted Steven Rutledge, and shot him. Smith contends that Osborne's testimony would have bolstered his claim that he acted in self-defense. In an affidavit attached to Smith's petition, Osborne states that he was willing to testify and would have testified that Traci Rutledge discharged the rifle and Smith returned fire, shooting the Rutledges. Osborne Aff. 1–2.[7]

Responding to this claim, the Director relies upon the affidavit of Smith's counsel. In the first two pages of his affidavit, Rivers details his investigation of Osborne's possible testimony and his reasons for deciding not to call him as a witness. Rivers Aff. 1–2. Rivers first notes that

---

[7] Smith attached to his Reply Brief a second affidavit from Osborne dated February 4, 2015. ECF No. 13-1, at 92. It is largely cumulative, but Osborne also claims that he would not have asserted his Fifth Amendment right against testifying had he been called as a witness. This assertion, coming years after the fact, addresses only one of the numerous reasons that Rivers cites in his decision not to call Osborne as a witness. Moreover, because Smith did not present this affidavit to the Virginia Supreme Court on state habeas review, this Court will not consider it. *See Cullen*, 131 S. Ct. at 1399.

Osborne and Johnny Roberts were indicted as Smith's co-defendants. He explains that he obtained Osborne's written statement from Smith's girlfriend, *see* Rivers Aff. Ex. A, ECF No. 24-4, at 33–34, went to the scene of the shooting with Osborne's counsel and took pictures, and spoke to Osborne's counsel about his client's intentions and possible testimony. When they discussed the possibility of Osborne testifying for Smith, Osborne's counsel told Rivers that he could not guarantee what Osborne might say. Rivers inferred that Osborne's counsel opposed his testifying for Smith. Rivers also learned that the Commonwealth's Attorney had offered Osborne a plea agreement in exchange for testifying against Smith. Based on this investigation, Rivers determined that Osborne was likely to testify for the Commonwealth. He also believed that Osborne would not be a reliable witness, in part because Osborne had made conflicting statements. Finally, Rivers was also concerned that Osborne might assert his Fifth Amendment rights and refuse to testify if called for the defense.

Denying Smith's claim, the Virginia Supreme Court determined that Rivers conducted a reasonable investigation into Osborne's potential testimony and made a tactical decision not to call him as a witness. Va. Sup. Ct. Slip Op. 1–3. The court finds no flaw in that determination.

"'[T]he decision whether to call a defense witness is a strategic decision, demanding the assessment and balancing of perceived benefits against perceived risks,' and a habeas court must give great deference to such decisions." *Cromartie v. Dir., Dept. of Corrs.*, No. 7:14cv215, 2015 WL 1505773, at *7 (W.D. Va. Mar. 31, 2015) (quoting *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004)). Rivers investigated Osborne's prior statements, discussed with Osborne's counsel his client's willingness to testify on Smith's behalf, and determined that his allegiance and the substance of his testimony were questionable. Considering that Osborne was a co-defendant, had received a plea offer from the Commonwealth's Attorney if he testified against

20

Smith, and had made inconsistent statements, Rivers had adequate grounds for concern. Rather than putting a witness, who he deemed unreliable, on the stand, Rivers prepared to cross examine Osborne should the Commonwealth call him.

Smith faults Rivers for not speaking to Osborne. Rather than showing deficient investigation, Rivers's conduct reflects the ethical restriction, which prohibits attorneys from having contact with represented parties, applicable to every attorney licensed to practice in Virginia. Va. Rules of Prof'l Conduct r. 4.2. Thus, Rivers's decision to speak to Osborne's counsel, rather than Osborne himself, does not show a lack of diligence or failure to interview a key witness. Instead, it shows that Rivers investigated Osborne's potential testimony in accordance with ethical rules. *See United States v. Dyess*, 730 F.3d 354, 362 (4th Cir. 2013) ("Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client.").

Consistent with the strategy identified in his affidavit, Rivers, at trial, cross examined Traci Rutledge and Johnny Roberts, focusing primarily on their inconsistent statements. Although Traci testified that she did not shoot the rifle and that it was not even loaded, Rivers introduced her prior statements that she did not know whether the rifle was loaded or whether she shot it. *Commonwealth of Virginia v. Smith*, No. CR100F0174 (Cir. Ct. Lee Cty.), Trial Tr. 860–64, 869–71, 903, 910–13, Nov. 3–15, 2010. Roberts testified that he had initially lied to police. *Id.* at 1092–94. Rivers questioned Roberts about his plea agreement, *id.* 1101, and his drug and alcohol abuse, *id.* at 1101–04, 1107-08, 1111, 1114–15. He also elicited testimony from Roberts that he saw a rifle barrel sticking out of the Rutledges' vehicle, Smith had his hand on the barrel, and he heard a shot that sounded distinctive from the firing of a .44 handgun. *Id.* at

21

1121–23, 1163–64. Roberts observed this sequence of events unfold before Smith began shooting into the Rutledges' vehicle. *Id.* at 1123. When Smith returned to Roberts's vehicle, he saw a wound like a burn on Smith's arm. *Id.* at 1126. Rivers was prepared to impeach Roberts with his prior inconsistent statements, but he determined that Roberts's testimony was not inconsistent with those statements, and he withdrew them. *Id.* at 1131–32, 1155–56, 1164. Although he adapted to the events that took place at trial, Rivers chose a strategy to impeach these two witnesses using their own inconsistent prior statements, rather than doing it through Osborne—a witness he deemed unreliable.

As all counsel must do, Rivers considered the potential benefits and risks of calling a witness to testify. "A fundamental reality of trial practice is that '[o]ften, a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses.'" *Terry*, 366 F.3d at 318 (quoting *Epson v. Hall*, 330 F.3d 49, 53 (1st Cir. 2003)). The Virginia Supreme Court determined that Rivers conducted a reasonable investigation and made a tactical decision not to call Osborne as a witness. I find that this determination was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts. Thus, I recommend that Claim I.A. be dismissed.[8]

    *b.*    *Failure to Seek Dismissal for Prosecutorial Misconduct for Witness Intimidation*

In Claim I.B., Smith argues that Rivers was ineffective for failing to move for dismissal of his case after the Commonwealth's Attorney threatened Osborne so that he left the courthouse

---

[8] The Virginia Supreme Court also found that Rivers may have determined that Osborne's testimony would not have supported a claim of self-defense given the other evidence presented at trial. This Court need not address this part of the Virginia Supreme Court's analysis of Rivers's decisionmaking, *see Terry*, 366 F.3d at 317 (noting "we cannot manufacture excuses for counsel's decision that he plainly did not [make]"), because the other basis for rejecting Claim I.A. was reasonable.

and did not testify for the defense. Smith Br. 14–18. Rivers avers that he is not, and presumably at the time of the trial was not, aware of the alleged threat. Rivers Aff. 2. The Virginia Supreme Court rejected Smith's claim, finding that Rivers was unaware of the alleged threat and had already determined not to call Osborne as a witness. Va. Sup. Ct. Slip Op. 3. Accordingly, the court determined that Smith had not demonstrated a deficient performance or prejudice.

Smith alleges that the prosecutorial misconduct occurred during trial. The prosecutor allegedly spoke only to Osborne's counsel, who in turn relayed the information to Osborne. No evidence shows that either Osborne or his counsel notified Rivers of the prosecutor's alleged statements. Jewell Woliver, Smith's mother, says she saw Osborne at the courthouse and spoke to him, but she provides no information about the alleged threat. *See* Woliver Aff., ECF No. 1-2, at 5. Assuming a threat was made, nothing in the record before the Virginia Supreme Court, or this Court, shows that Rivers was aware of it. Absent a showing that Rivers could have or should have discovered this alleged threat, I cannot find that he performed deficiently by not raising an argument that was premised upon an allegation of prosecutorial misconduct of which he was unaware. Accordingly, I find that the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts. Thus, I recommend that Claim I.B. be dismissed.

c. *Failure to Call Harold Smith as a Witness*

In Claim I.C., Smith argues that Rivers was ineffective for not calling Harold Smith, the Petitioner's father, to testify at trial to impeach Johnny Roberts. Smith Br. 18–20. Harold Smith states that he gave Roberts's written statement to Rivers. Harold Smith Aff, ECF No. 1-2, at 4. Harold Smith also states that Roberts told him that Traci Rutledge shot a high-powered rifle at Smith, and Smith acted in self-defense. *Id.* In response, Rivers asserts that he spoke to Harold

Smith numerous times. Rivers Aff. 2. Harold Smith told him that he did not want to have anything to do with his son, but at other times he offered to help. *Id.* at 2–3. Based on Harold Smith's ever-changing attitude toward Smith and his characterization of his son as "wild" and a "hot head," Rivers was concerned that Harold Smith could harm the defense if called as a witness. *Id.* at 3. Rivers also determined that his best mode of impeaching Johnny Roberts was through his prior inconsistent statements, such as the written one provided by Harold Smith. *Id.* This handwritten statement about the shooting is attached to Rivers's Affidavit. Rivers Aff., Ex. B, ECF No. 24-4, at 35–40. In that statement, Roberts wrote that when Smith got out of his vehicle, he put a gun in his pants. Roberts heard gunfire, looked back, and saw Smith's back to the Rutledges' vehicle from which a rifle was protruding. He then heard more gunshots. The Rutledges' vehicle began to move, and Roberts thought it might run over Smith, but then it drove away.

The Virginia Supreme Court found that Rivers's decision not to call Harold Smith as a witness was a reasonable tactical decision. Va. Sup. Ct. Slip Op. 4. The court also determined that Roberts testified at trial that he had lied to police in prior statements and his prior inconsistent statement was admitted at trial. Thus, the court found that Rivers's performance was not deficient, and the errors alleged by Smith did not cause prejudice.

The Virginia Supreme Court's analysis rests upon determinations that Rivers had reasonable grounds to question Harold Smith's reliability and he had a reasonable, alternate approach for impeaching Johnny Roberts. Rivers's numerous conversations with Harold Smith provided an adequate basis for Rivers to assess his willingness to help and his reliability. Rivers also determined that Roberts's own prior inconsistent statements were more valuable than the testimony Harold Smith could offer. The Virginia Supreme Court reasonably determined that

24

Rivers made a reasonable, tactical decision not to call Harold Smith and that his performance was not deficient.

In evaluating the prejudice prong, the Virginia Supreme Court considered the trial proceedings. Under cross examination at trial, Roberts testified that he saw a rifle barrel sticking out of the Rutledges' vehicle, he saw Smith had his hand on the barrel, and he heard a shot that sounded distinctive from the firing of a .44 handgun. Trial Tr. at 1121–23, 1163–64. This all happened before he saw Smith begin shooting into the Rutledges' vehicle. *Id.* at 1123. During this examination, Rivers began to impeach Roberts with his prior inconsistent statements, but the Commonwealth's attorney objected. *Id.* at 1131–32. Counsel engaged in a lengthy discussion with the trial court about the manner of admitting prior inconsistent statements. After further developing Roberts's testimony on cross examination, Rivers determined that his testimony was not inconsistent with his prior statements, and he did not seek to admit them into evidence. *Id.* at 1155–56, 1164. Thus, a review of the trial transcript shows that Rivers did not introduce Roberts's prior statements into evidence. Rivers's recollection that Roberts's statement was read to the jury, Rivers Aff. 3, is wrong, and the Virginia Supreme Court's similar finding, Va. Sup. Ct. Slip Op. 4, is also incorrect. Roberts's testimony on cross examination, however, was largely consistent with his written statement that one of the Rutledges was the aggressor. Thus, while a portion of the Virginia Supreme Court's assessment of prejudice rests upon a faulty finding of fact—that Rivers introduced Roberts's statement—it is of no moment because the substance of his prior statement was presented to the jury through Rivers's cross examination. Accordingly, I find that the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts, and Claim I.C. must be dismissed.

25

*d.*      *Failure to Call Jewell Woliver as a Witness*

In Claim I.D., Smith asserts that Rivers should have subpoenaed Smith's mother, Jewell Woliver, to testify about Osborne's statements to her. Smith Br. 20–23. Woliver states that Osborne told her that Traci Rutledge pointed a rifle at Smith and discharged it. Woliver Aff. Smith fell into the road, and Rutledge tried to run him over. *Id.* As Smith ran away, he fired shots into Rutledge's vehicle. *Id.* Smith contends that after Osborne left the courthouse because of the prosecutor's threats, Rivers should have called Woliver to testify about Osborne's statements to her. Rivers responds that Woliver's statements were hearsay. Rivers Aff. 3–4.

The Supreme Court of Virginia found that Woliver's statements would have amounted to hearsay; thus, it determined that Smith had demonstrated neither deficient performance nor prejudice. This determination rests upon an evaluation of state rules of evidence. A federal habeas court cannot second guess the state court's rulings on admissibility of evidence. *Freeman v. Watson*, No. 7:12cv168, 2013 U.S. Dist. LEXIS 18268, at *31 (W.D. Va. Feb. 11, 2013) (Conrad, C. J.) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

Smith contends that the prosecutor's alleged threat made Osborne unavailable, providing an exception to the hearsay rule. Even if the Court were to credit this argument, Rivers has stated that he did not know of the alleged threat. Thus, he could not have known the basis for Osborne's unavailability, had he even intended to call him as a witness. Accordingly, Claim I.D must fail because the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts.

*e.*      *Conflict of Interest*

In Claim I.E., Smith argues that Rivers's representation was tainted by a conflict of interest. Smith Br. 23–25. Smith asserts that the Commonwealth's Attorney provided Rivers an

audio tape of a jail phone call between Smith and his family wherein Smith made derogatory statements about Rivers and his handling of the case. After Rivers received the tape, Smith believes his attitude changed. Smith cites the other claims in his Petition as evidence that Rivers's alleged conflict affected his representations. *Id.* at 25. Rivers acknowledges receiving the audio tape. Rivers Aff. 4. He characterizes Smith's remarks about counsel and many other topics as disparaging. *Id.* Rivers asserts that it is not uncommon for criminal defendants to express their dissatisfaction with their attorneys, and he contends that Smith's comments did not adversely affect his resolve or zeal in representing him. *Id.*

The Virginia Supreme Court determined that this claim met neither prong of *Strickland*. The court explained that Smith had not demonstrated that the derogatory comments divided his counsel's loyalty or how the alleged conflict impacted his counsel's actions. Accordingly, the court found that Smith had not established an actual conflict or an adverse affect on Rivers's performance. Va. Sup. Ct. Slip Op. 5.

"The attorney-client relationship begets a duty of loyalty— one that requires the attorney to remain free from conflicts of interest." *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009). "To establish a violation of his *Sixth Amendment* right, 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). Prejudice is presumed if a defendant can show (1) an actual conflict of interest (2) that adversely affected his representation. *Id.* (citing *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 348–50)).

Merely subjecting Rivers to the disparaging comments of his client does not show an actual conflict of interest, and Rivers unequivocally denies that Smith's comments inhibited his duty of loyalty or affected his presentation of the defense. Moreover, Smith does not explain how

27

his disparaging comments created a conflict other than that Rivers's demeanor "changed" and he became "more serious." Smith Br. 23. Considering the relatively benign nature of the alleged conflict, such conclusory allegations fall far short. *See United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."). Accordingly, the Virginia Supreme Court's determination that Smith had not shown an actual conflict was not unreasonable.

Even if Rivers could show an actual conflict, he would also have to demonstrate an adverse effect. To establish adverse effect,

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. … Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens v*, 240 F.3d at 361.

As the only evidence of adverse affect, Smith identifies Rivers's decision not to call "crucial" witnesses, presumably those he mentions in other sections of the Petition, to impeach the Commonwealth's evidence. Smith Br. 25. Rivers has provided reasons for his strategic decisions, including his decision not to call Osborne and Harold Smith. The Virginia Supreme Court properly determined that those decisions were reasonable. Thus, Smith has not established an adverse effect on his counsel's performance. Accordingly, I find that the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts, and Claim I.E must be dismissed.

*f.*      *Failure to Pursue Scientific Testing*

In Claim I.F, Smith argues that Rivers provided ineffective assistance of counsel for not pursuing certain scientific testing. Smith Br. 25–28. He faults Rivers for not obtaining testing of gunshot residue collected from Smith's left forearm, the inside of the Rutledges' pickup truck, and Steven Rutledge to determine whether it came from the .44 revolver or the rifle. He also faults Rivers for not obtaining latent fingerprint testing from the rifle. *Id.* at 25–26. Smith argues that the gunshot residue testing would have shown that Traci Rutledge fired the rifle and that latent fingerprint testing would have shown that Smith grabbed the rifle's barrel. *Id.* at 26–28. The testing, according to Smith, would have corroborated his claim of self-defense. *Id.* at 28.

In his Affidavit, Rivers notes that testing of the gunshot residue from the .44 revolver was unnecessary to his claim of self-defense because the evidence was not in dispute that Smith fired the .44 revolver and the bullets entered the Rutledges' vehicle, striking both of them and killing Steven. Rivers. Aff. 4. As to gunshot residue from the rifle, Rivers was unaware of any tests that could differentiate between the residue from the revolver and the rifle. Ultimately, Rivers chose a strategy of trying to exploit the "possible improper or incomplete investigation of the whole case . . . through cross examination of the expert witnesses and the police themselves." *Id.*

Addressing this claim, the Virginia Supreme Court found:

> the record, including the trial transcript, shows that numerous witnesses testified that any further fingerprint examination of the rifle would potentially have destroyed any available DNA evidence, that petitioner admittedly fired several times into the pickup truck, that bullets from his pistol struck and killed the victim, and that no physical evidence suggested the rifle had been fired. Witnesses further testified that, except in very rare cases, a laboratory could not test residue to determine if it came from a certain type of ammunition, that to do so the laboratory would need the spent shell casing, and that no such casings were recovered in this case. Counsel could reasonably have determined independent testing of the rifle and pistol would not have been helpful to petitioner's case.

29

Va. Sup. Ct. Slip Op. 6. Accordingly, the court determined that Smith had shown neither deficient performance nor prejudice. The Court finds that this decision withstands scrutiny.

As evident from his affidavit, Rivers determined that challenging the adequacy of the Commonwealth's investigation would be more productive than pursuing scientific testing.

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

At trial Rivers pursued his strategy, probing the reasons that certain scientific tests were or were not conducted and who made those decisions. Testimony showed that Lieutenant James Hartsock and other members of the Jonesville Police Department requested that the Laboratory test certain items of evidence. Trial Tr. 273, 280, 300–01. Lieutenant Hartsock sent to the Laboratory six .44 shell casings, the .270 caliber Mossberg rifle, gunshot residue kits from Steven Rutledge and Smith, and the .44 revolver. *Id.* at 277–78. The officers requested that the Laboratory perform touch DNA and DNA bloodstain tests of the .44 revolver; latent fingerprint, touch DNA, and DNA bloodstain tests of the rifle; latent fingerprint tests of the .44 shell casings and two nine millimeter cartridges; and tests of the gunshot residue kits. *Id.* at 280–82. On cross examination, Rivers elicited testimony from Lieutenant Hartsock that the Laboratory will not test gunshot residue from a victim because it is expected that gunshot residue will be on a shooting victim. *Id.* at 297–99. He also explored whether different types of gunpowder would leave

different residue, but Hartsock did not know whether a difference in the type of powder used could be determined through gunshot residue testing. *Id.* at 306–07.

Douglas DeGaetano, a Laboratory employee who analyzes primer and gunshot residue,[9] testified that he received the gunshot residue kit for Smith. *Id.* at 364, 373–74. Testing of the kit revealed that the substance taken from Smith's left hand was primer residue. *Id.* at 376–77. When asked whether he could determine the source of gunshot residue, he testified that it "would be unusual to be able to say that, yes, this type of particle came from this certain type of ammunition that was fired through this certain weapon. On rare occasions there are cartridge cases that may have a different primer makeup" that is consistent with a certain type of ammunition, but one would need the spent shell or cartridge casing to conduct that analysis. *Id.* at 380. On cross examination, DeGaetano agreed that one could obtain a primer sample from the barrel of a rifle, but if various types of ammunition had been fired from the rifle, various residues would mix together. *Id.* at 388–89. He conceded that he was not asked to test the rifle or to conduct primer analysis on a sample from Traci or Steven Rutledge, but only one from Smith. *Id.* at 383–84. Later in the trial, Rivers cross examined a law enforcement officer about not obtaining a gunshot residue sample from Traci Rutledge. *Id.* at 599.

Lyle Shaver, a scientist in the latent fingerprint section of the Laboratory, also testified. *Id.* at 391. He conducted a visual examination of the barrel of the rifle, and was unable to identify any visible ridge detail indicating a fingerprint. *Id.* at 400, 402, 408–09. Shaver consulted with Kevin Flint, a forensic scientist at the Laboratory who conducts DNA analysis,

---

[9] DeGaetano testified that the terms primer and gunshot residue are used interchangeably, even by him, but actually refer to different things. Trial Tr. 367. Primer is the substance in a cartridge that explodes when struck and it ignites the gunpowder, expelling the bullet from the barrel of a firearm. Gunshot residue is anything that blows out of the barrel of a firearm, and it may include primer.

and Lieutenant Hartsock about what further testing to conduct. *Id.* at 403–04, 409–12. Shaver was concerned that additional fingerprint testing could destroy the evidence for DNA analysis, and they were intent on "optimizing [their] opportunity to develop prints or get DNA." *Id.* at 404; *see also id.* at 412 ("We're obviously trying to get the best evidence we can from each item of evidence."). Rivers cross examined Shaver about the thoroughness of his examination of the rifle and the decision not to pursue further analysis of it. *Id.* at 409–10.

Flint testified that he and others at the Laboratory, in consultation with police, generally conduct testing in a manner to preserve evidence and get the most probative value from the evidence. *Id.* at 452. In Smith's case, he attempted to obtain a profile of touch DNA[10] from the barrel of the rifle. *Id.* at 435. The DNA profile that he developed, however, was of no use because he could not draw any conclusions from its results. *Id.* at 436. On cross examination, Flint testified that Shaver examined the rifle's barrel for fingerprints before DNA testing was conducted because any prints on the rifle would be destroyed when Flint swabbed the barrel to develop a DNA profile. *Id.* at 441–42. He acknowledged finding a mixture of DNA on the rifle's barrel, which indicated that more than one person contributed DNA to it. *Id.* at 442–43. Flint testified that he tested for touch DNA on the barrel because Smith alleged that he had grabbed it, and that Hartsock had requested such testing. *Id.* at 447–48.

The trial transcript shows that through his cross examination of the scientists, Rivers developed evidence that multiple DNA profiles, none of which could be identified, were found on the rifle's barrel, and he challenged the thoroughness of the Commonwealth's investigation. Throughout the trial, he also developed other evidence to sow doubt and advance Smith's claim

---

[10] Flint explained, "[t]ouch DNA is where a person or an individual grabs an item and leaves skin cells or sweat on the item of evidence, and we'll actually swab those areas in order to attempt to develop a [DNA] profile from the person that has touched that item." Trial Tr. 426–27.

32

of self-defense. As discussed in section III.C.1.a., *supra*, Rivers introduced Traci Rutledge's prior statements that she did not know whether the rifle was loaded or whether she shot it. Rivers also elicited testimony from Roberts that he saw a rifle barrel sticking out of the Rutledges' vehicle, Smith had his hand on the barrel, and he heard a shot that sounded distinctive from the firing of a .44 handgun. When Smith returned to Roberts's vehicle, he saw a wound like a burn on Smith's arm. All of this evidence was directed toward establishing that the rifle was fired.

On the other hand, evidence admitted at trial also showed that the rifle had not been fired. Traci Rutledge testified that she did not fire the rifle and that it was not even loaded. When police recovered the rifle from the Rutledges' pickup truck, it contained no ammunition, and no spent casing was in the chamber. Trial Tr. 562–63, 602. Additionally, no spent shell casing from the rifle was ever recovered, although two nine millimeter unfired cartridges were located at the scene of the shooting.[11] *See id.* at 649. Rivers cross examined the police officers about the adequacy of their search for other shell casings, Trial Tr. 669–73, but no other physical evidence showed the rifle had been fired.

Notwithstanding this evidence, Smith faults Rivers for not developing scientific testing that he surmises would have conclusively shown that Traci Rutledge discharged the rifle. Even assuming that gunshot residue testing could have determined whether the rifle was fired, all of the physical evidence indicates a strong probability that such testing would have reached a different result than that hoped for by Smith. A conclusive test result that the rifle was not fired would have contradicted Smith's evidence and completely undermined his theory of self-defense. By not foreclosing, through an adverse test result, the possibility that the rifle was fired, Rivers was able to preserve and pursue, by other means, Smith's self-defense theory. "To

---

[11] Officers recovered six spent .44 shell casings from a trashcan at Harold Smith's residence where they also located the .44 revolver. Trial Tr. 323–24, 329–32.

support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington*, 562 U.S. at 109. This is especially so where the effort to exonerate could have the opposite result. *Id.* at 108–09. Under these circumstances, "[a]n attorney need not pursue an investigation that would be fruitless much less one that might be harmful to the defense." *Id.* at 108.

Rivers's decision not to obtain scientific testing of the gunshot residue does not suggest a failure to investigate or to weigh the potential benefits and pitfalls of scientific testing. To the contrary, Rivers's cross examination of the Commonwealth's witnesses, including those from the Laboratory, showed that he thoroughly investigated the evidence, including the scientific testing that was performed, and he sought to exploit the deficiencies in that testing and the Commonwealth's investigation in general. Considering the evidence in this case, the Virginia Supreme Court appropriately determined that Rivers made a reasonable decision not to conduct testing of questionable value. *Id.* at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Moreover, Smith has not shown prejudice. Nothing in the record shows that the testing he seeks would have produced the results he desires. The fingerprint examiner was unable to identify fingerprint ridges on the rifle, and the DNA analyst could not develop a sample of value. Similarly, DeGaetano testified that it is unusual to identify that a particular firearm was discharged based on gunshot residue testing, but that in rare circumstances this identification could be made using the spent shell casing. No spent shell casing from the rifle was recovered; thus, this possible line of testing was foreclosed.

Accordingly, I find that the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts. Thus, I recommend that Claim I.F. be dismissed.

g.      *Cumulative Errors*

In Claim I.G., Smith asserts that his counsel's cumulative errors, which Smith sets forth individually in Claims I.A–F, rendered his assistance ineffective. Smith Br. 28–32. The Supreme Court of Virginia, adhering to its precedent, rejected the legal basis for Smith's cumulative errors argument. Va. Sup. Ct. Slip Op. 7. Noting that it had denied Smith's individual claims of ineffective assistance of counsel, the court also determined that he had not demonstrated prejudice from any accumulation of his counsel's alleged errors.

This Court has also rejected the cumulative errors argument: "It is well established in the Fourth Circuit that the habeas court must 'individually assess' each allegation of defense counsel error, rather than considering whether the cumulative impact of counsel's several alleged errors might add up to deficient performance." *Cromartie*, 2015 WL 1505773, at *11; *accord Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998). As discussed in this Report and Recommendation, I find that Smith has stated no meritorious claims in his Petition. Accordingly, I find that the Virginia Supreme Court's decision was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts. Thus, I recommend that Claim I.G. be dismissed.

2.      *Scientific Testing*

In Claim III, Smith asserts that the trial court erred in not setting aside the jury's verdict based on the Commonwealth's cancellation of certain scientific tests that Smith contends would have provided exculpatory evidence in support of his self-defense theory. Smith Br. 38–50.

35

According to Smith, gunshot residue testing would have confirmed that the rifle was fired and fingerprint testing would have confirmed that he grabbed the barrel of the rifle. Smith claims that the cancellation of these tests violated his due process rights. *Id.* at 43–46. He also argues that the Commonwealth acted in bad faith. *Id.* at 47–49.

Smith's counsel initially raised this issue before the trial court in a post-trial motion. Rivers argued that Smith's conviction should be set aside and a new trial ordered because the Commonwealth stopped or failed to continue testing that may have provided exculpatory evidence. *Commonwealth v. Smith*, No. CR100F0174 (Cir. Ct. Lee Cty.), Record [hereinafter Cir. Ct. R.] 363–66. At a hearing on the motion, Rivers explained that he had requested the disclosure of all exculpatory evidence and the results of any scientific tests. *Commonwealth v. Smith*, No. CR100F0174 (Cir. Ct. Lee Cty.), Sentencing Tr. 11–15, June 16, 2011. He noted that no testing was done of the wound to Smith's left forearm or the gunshot residue and that testing of the rifle and .44 revolver was ordered, but canceled.

The trial court noted that Rivers had vigorously cross examined the Commonwealth's Laboratory witnesses about why certain tests were or were not performed. Sentencing Tr. 34. The court recalled that the testimony showed that the Commonwealth performed the tests that it deemed were most valuable and did not select tests for the purpose of avoiding the discovery of exculpatory evidence. *Id.* at 35. Therefore, the court denied the motion.

Reviewing the trial court's decision, the Virginia Court of Appeals discussed the testimony of DeGaetano, Hartsock, Shaver, and Flint regarding the specific issues presented by conducting testing for gunshot residue, fingerprints, and DNA for the rifle and .44 revolver. Va. Ct. App. Slip Op. 3–4. It recounted DeGaetano's testimony that "the laboratory could not test the gunshot residue to determine if it came from ammunition consistent with the rifle Traci pointed"

36

at Smith unless it had spent shell casings from the rifle. *Id.* at 4. Additionally, Shaver testified that he could not find a visible fingerprint ridge detail on the rifle and, after consulting with other scientists, determined to cease fingerprint analysis in favor of DNA analysis. He was concerned that further fingerprint analysis would "mess up" the DNA testing. Applying *Youngblood v. Arizona*, 488 U.S. 51 (1988), the court of appeals upheld the trial court's decision. It credited the trial court's findings, determined that no evidence showed that the Commonwealth had acted in bad faith in deciding not to conduct the testing at issue, and found that "the Commonwealth provided scientific reasons for not conducting the tests." Va. Ct. App. Slip Op. 4. Accordingly, the court of appeals rejected Smith's challenge.

As he did on direct appeal, Smith argues that the Commonwealth violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by electing not to conduct testing of the gunshot residue on his arm and fingerprint and DNA testing of the rifle. The Supreme Court in *Brady* held, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Smith does not contend that the Commonwealth's Attorney failed to provide him with the results of tests that were conducted. Instead, he challenges the Commonwealth's decision not to do certain tests. The non-existent testing is "not the material exculpatory evidence addressed in *Brady*"; rather, the evidence that Smith faults the Commonwealth for not testing is "potentially useful evidence," which Smith at most could hope would provide exculpatory evidence through testing. *Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam). In that circumstance, to establish a violation of due process, the defendant must show bad faith on the part of the Commonwealth in failing "to preserve evidentiary material of which no more can be said than that it could have been subjected

to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 58. A showing of bad faith is necessary regardless of whether the defendant made discovery requests for exculpatory evidence. *Fisher*, 540 U.S. at 548. Although Smith does not contend that police destroyed evidence, the bad-faith analysis also applies to claims about the government's decision not to pursue testing of potentially exculpatory evidence. *See Reed v. Clarke*, No. 2:12cv148, 2012 WL 4754660, at *10–11 (E.D. Va. Sept. 5, 2012) (applying bad faith analysis to claim that police did not investigate witness who may have provided exculpatory evidence).

Testimony from the trial showed that Lieutenant Hartsock and other police officers requested latent fingerprint and touch DNA testing on the rifle's barrel and gunshot residue testing. They made these requests because Smith alleged he had grabbed the barrel. No testimony or other evidence indicated that the Laboratory scientists or the police avoided the gunshot residue or fingerprint testing in bad faith or out of concern that it would possibly exculpate Smith. To the contrary, Shaver and Flint testified that they conduct testing, in consultation with the police, in an effort to obtain the most probative evidence. Additionally, as the court of appeals found, the Commonwealth determined not to conduct the testing at issue for valid scientific reasons. Shaver stopped testing for fingerprints on the rifle's barrel after he was unable to identify ridge detail and because he was concerned that further pursuit of fingerprints could destroy the sample for more promising DNA testing. The DNA testing was conducted, but it did not result in an identifiable DNA profile. DeGaetano tested the gunshot residue kit from Smith and determined that it showed primer from his left hand. He further testified that the gunshot residue testing that Smith proposes would not usually be obtainable and in the rare instance that it was would require a spent shell casing from the gun, which did not exist. Nothing in these explanations shows bad faith on the part of the Commonwealth.

Smith also contends that the Laboratory could have compared the shell casings from the .44 revolver to the gunshot residue on his left arm and determined whether it matched. Pet'r Br. 48–49. He posits that the absence of a match could prove that the gunshot residue came from the rifle. Yet, the rare instance of matching gunshot residue to a firearm that Degaetano described involves making a positive match, whereas Smith proposes a test of exclusion. He does not cite any evidence to support his assertion that such testing is capable of achieving the hoped-for result, much less that DeGaetano, or anyone else, knew of and deliberately avoided performing such testing. That the Commonwealth did not conduct this hypothetical test does not show bad faith. *See Robinson v. Lewis*, No. 5:12cv2021, 2013 WL 1182658, at *11 (E.D.N.C. Mar. 21, 2013) ("[T]here is no constitutional requirement that all physical evidence be subjected to forensic testing such that the failure to conduct such testing could constitute bad faith.").

Accordingly, I find that the decision of the Virginia Court of Appeals was neither contrary to nor an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts, and I recommend that this claim be dismissed.

### 3. *Speedy Trial*

In Claim IV, Smith argues that his speedy trial rights, as guaranteed by the Sixth Amendment, were denied by a delay of four months between his arrest and his preliminary hearing. As found by the Virginia Court of Appeals, Smith was arrested on March 5, 2010, and arraigned three days later. Va. Ct. App. Slip Op. 5. His preliminary hearing was scheduled for March 24, 2010, but it was continued four times at the Commonwealth's Attorney's request and two times at Smith's co-defendants' request because of their counsels' scheduling conflicts. The preliminary hearing was conducted on August 13, 2010. At that point Smith had been held in

detention for 162 days. He was indicted on September 13, and his trial began on November 3, 2010.

Before sentencing in the circuit court, Smith filed a motion for a new trial. He argued that his speedy trial rights were violated by the delay between his arrest and preliminary hearing. He noted that he objected to all of the Commonwealth's Attorney's requests for continuances, and he argued that the delays "served to prejudice his defense and have caused him great concern, anxiety, and public ridicule." Cir. Ct. R. 364. At the motion hearing, Rivers offered no additional facts or evidence to support his claim of a speedy trial violation. Sentencing Tr. 7–9. The Commonwealth's Attorney argued that he had requested continuances of the preliminary hearing because laboratory testing and autopsy analyses had not been finished. *Id.* at 17–18. The trial court denied the motion, finding that Smith had asserted his rights, but had shown no prejudice other than a deprivation of liberty. *Id.* at 26, 28. The court further found that the delays were for good cause. *Id.* at 28. Reviewing the trial court's decision, the court of appeals found that the delay of five months, having been caused by awaiting the results of laboratory testing and an autopsy, did not violate Smith's speedy trial rights. Va. Ct. App. Slip Op. 4–5.

In assessing whether a delay has violated the Sixth Amendment's speedy trial guarantee, a court must consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). To establish a violation, a defendant must show that on balance these four factors weigh in his favor. *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009). Smith does not challenge the time between his indictment and trial, which was less than two months; instead, he asserts that the delay between his arrest and the preliminary hearing violated his rights.

"By definition, the constitutional right to a speedy trial is triggered by an indictment; it does not protect a defendant from a pre-indictment delay." *Hall*, 551 F.3d at 271. The Due Process Clause, rather than the Sixth Amendment, protects defendants "'from actual prejudice resulting from the passage of time between crime and arrest or charge.'" *Id.* (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). To establish a violation of due process, the defendant must show actual prejudice or intentional government misconduct. *Id.* at n.18 (citing *Marion*, 404 U.S. at 324–25).

Smith claims prejudice from the length of his incarceration before having the preliminary hearing—162 days. Smith Br. 53. This sort of general prejudice from delay is inadequate, and Smith cites no harm to the preparation or presentment of his defense. *Id.* at 273 (citing unavailability of witness, diminished memory of events, and loss of exculpatory evidence as examples of possible prejudice). Smith also claims that the prosecution delayed the preliminary hearing until the tests and lab analysis were complete. These delays show nothing more than a desire to be prepared and to have adequate evidence before proceeding in a prosecution on serious charges. They certainly do not establish intentional misconduct.

The Virginia Court of Appeals applied the four factor analysis in *Barker*, focusing on the reasons for the delays and any prejudice to Smith. Its decision was neither an unreasonable application of federal law nor an unreasonable application of the facts. Accordingly, this claim must be dismissed.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Respondent's motions to dismiss, ECF No. 8, and **DISMISS** Smith's petition, ECF No. 1, with prejudice.

41

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTER: February 1, 2016

Joel C. Hoppe
United States Magistrate Judge